UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
INTERESTED UNDERWRITERS AT
LLOYD'S, LONDON subscribing to policy
number BO5801C0917980, As subrogee of
AMSHIELD LIMITED, MOHAN MURJANI,
and GUNI MURJANI,

                        Plaintiff,

  -against-

ATLANTIC FINE ART SERVICES, INC. and
ELLSWORTH F. LANK, JR.,

                        Defendants.
----------------------------------------------------------X

**REPORT AND RECOMMENDATION**

11-CV-00569 (DLI) (RER)

**RAMON E. REYES, JR., U.S.M.J.:**

**TO THE HONORABLE DORA L. IRIZARRY, UNITED STATES DISTRICT JUDGE**

Plaintiff Interested Underwriters at Lloyd's, London, subscribing to policy number BO5801C0917980, ("Underwriters" or "Plaintiff"), as subrogee of Amshield Limited ("Amshield"), Mohan Murjani, and Guni Murjani (collectively, "Murjani"), brought this action against Defendants Atlantic Fine Art Services, Inc. ("Atlantic") and Ellsworth F. Lank, Jr. ("Lank") (collectively, "Defendants") for breach of their bailment agreement, negligence, and conversion.

Due to Defendants' failure to answer or otherwise appear in this action, the Clerk of Court entered default against Defendants on May 20, 2011, pursuant to Federal Rule of Civil Procedure 55(a). (Docket Entry 6.) The Honorable Dora L. Irizarry subsequently referred the

1

matter to me for a report and recommendation. (Docket Entry, 5/23/2011.) On August 3, 2011, Underwriters filed a motion for default judgment and submitted a memorandum and documents in support of its motion. (Docket Entry 9.)

For the reasons stated herein, I respectfully recommend that Underwriters' motion be granted and default judgment be entered against Defendants, jointly and severally, in the amount of $795,000.00 in damages, $50,181.12 in prejudgment interest, and $196.02 per diem in interest from August 1, 2011 until the date of entry of final judgment.

## **BACKGROUND**

Amshield / Murjani owned "The Mother Theresa," which was an oil-on-canvas painting insured under Underwriters, through HSBC Insurance Brokers Limited, as part of insurance policy number BO5801C0917980. (Affidavit of Charles Schramm ("Schramm Aff."), dated August 3, 2011, ¶¶ 4-6, Exh. A; Compl. ¶¶ 9-11.) The insurance policy gave "The Mother Theresa" a designated value of £500,000 GBP. (Schramm Aff. ¶ 6, Exh. A; Compl. ¶ 11.)

Beginning in August 2004, Amshield / Murjani began to pay storage fees to Atlantic to store its painting collection, including "The Mother Theresa," at Atlantic's warehouse in Long Island City, New York. (Schramm Aff. ¶¶ 7-8, Exh. C; Compl. ¶¶12-13.) On March 16, 2007, Amshield / Murjani emailed Lank to request that Atlantic deliver several of its art pieces, including "The Mother Theresa," to Sotheby's auction house in New York. (Schramm Aff. ¶ 9, Exh. D; Compl. ¶ 14.) Atlantic delivered the pieces to Sotheby's, and in August 2007, Atlantic collected the pieces, including "The Mother Theresa," from Sotheby's. Atlantic then delivered the pieces back to its warehouse in Long Island City, where they were signed for by Greg Arciniege of Atlantic. (Schramm Aff. ¶¶ 10-11, Exh. E; Compl. ¶ 15.) Subsequently, Guni

Murjani began to compile a catalogue of M.F. Husain's works that Amshield / Murjani owned, so she visited Atlantic's Long Island City warehouse in November 2009. At this time, Guni Murjani personally saw "The Mother Theresa" in Atlantic's warehouse. (Compl. ¶¶ 16-17.) Amshield / Murjani then directed Atlantic to transfer the Hussain paintings to Fortress storage facility for photographing for the catalogue. (*Id.* ¶ 18.) However, Atlantic failed to transfer any of the larger Hussain paintings, including "The Mother Theresa," to Fortress. (*Id.* ¶ 19.) Lank apologized to Guni Murjani about failing to transport the larger Hussain paintings to Fortress, and he admitted that he did not know where these paintings were located. (*Id.* ¶ 21-22.) Guni Murjani then traveled to Atlantic's Long Island City warehouse, where she realized that Atlantic had transferred the Amshield / Murjani paintings to its Brooklyn warehouse without notifying Amshield / Murjani or receiving their permission. (*Id.* ¶ 23.) Guni Murjani then searched Atlantic's Brooklyn warehouse for the missing paintings and located all of them, except for "The Mother Theresa." (*Id.* ¶ 24.) Further searches were unsuccessful in locating "The Mother Theresa," and Atlantic eventually admitted that it was lost. (*Id.* ¶¶ 25-26; Schramm Aff. ¶¶ 13-14, Exh. F.)

In April 2010, Amshield / Murjani submitted a claim to Underwriters to recover for the loss of "The Mother Theresa." (Schramm Aff. ¶ 16; Compl. ¶ 29.) Underwriters investigated the claim and adjusted the claim for the insured value of "The Mother Theresa" under the policy, £500,000 GBP. (Schramm Aff. ¶ 16; Compl. ¶ 30.) Amshield / Murjani executed a settlement agreement and accepted the sum of £500,000 GBP from Underwriters for the loss of "The Mother Theresa." (Schramm Aff. ¶ 16-17, Exh. G-H; Compl. ¶ 30.) By accepting the settlement agreement and receiving the £500,000 GBP, Amshield / Murjani subrogated all of their rights

related to "The Mother Theresa" to Underwriters. (Schramm Aff. ¶ 18, Exh. G-H; Compl. ¶ 32.) Based on the currency exchange rate in effect on November 17, 2010, £500,000 GBP equaled $795,000.00. (Schramm Aff. ¶19, Exh. I; Compl. ¶ 31.)

## DISCUSSION

### I. Liability

A party's default constitutes an admission of all well-pleaded factual allegations of liability set forth in the complaint. *Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*, 973 F.2d 155, 158 (2d Cir. 1992) (citations omitted); *Flaks v. Koegel*, 504 F.2d 702, 707 (2d Cir. 1974) (citations omitted). Underwriters is entitled to an entry of default by virtue of Defendants' failure to respond to Underwriters' complaint, to respond to Underwriters' Motion for Entry of Default Judgment, to notice any appearance on Defendants' behalf, or to otherwise defend against this lawsuit. (Docket Entry 6.)

"[T]he sole issue that remains before the court is whether the plaintiff has provided adequate support for the relief it seeks." *A I Marine Adjusters, Inc. v. M/V SIRI BHUM*, No. 05-CV-7227 (LBS) (THK), 2007 WL 760415, at *2 (S.D.N.Y. Feb. 8, 2007) (citations omitted). Before awarding damages, it is within the purview and discretion of the court to determine whether the factual allegations establish the defaulting party's liability as a matter of law. *Au Bon Pain Corp. v. Artect, Inc.*, 653 F.2d 61, 65 (2d Cir. 1981).

### A. Bailment Agreement

Underwriters has offered ample proof to establish that its relationship with Defendants

constituted a bailment agreement. Under New York law:[1]

> A bailment is defined as a delivery of personal property for some particular purpose, or a mere deposit, upon a contract express or implied, and that after such purpose has been fulfilled it shall be redelivered to the person who delivered it, or otherwise dealt with according to his directions or kept until he reclaims it, as the case may be. It is essential that there be either an actual or constructive delivery by the bailor as well as actual or constructive acceptance by the bailee.

*Mays v. New York, N.H. & H.R. Co.*, 97 N.Y.S.2d 909, 911 (N.Y. Sup. Ct. App. Term 1950) (citing 8 C.J.S., Bailments, § 1; *Osborn v. Cline*, 263 N.Y. 434, 437 (1934)). *See also Foulke v. N.Y. Consol. R. Co.*, 228 N.Y. 269, 275 (1920) (explaining that a bailment relationship depends on "lawful possession . . . and duty to account for the thing as the property of another") (citations omitted). Moreover, "[t]he determination as to whether the relationship is one of bailor and bailee turns on whether there is a relinquishment of exclusive possession, control and dominion over the property." *Isik Jewelry v. Mars Media, Inc.*, 418 F .Supp. 2d 112, 120 (E.D.N.Y. 2005) (quoting *Hutton v. Public Storage Mgmt., Inc.*, 177 Misc.2d 540, 541 (N.Y. Sup. Ct. 1998)). *See also People v. Wilson*, 93 N.Y.2d 222, 227-28 (1999) (describing that a bailment only exists when the object is delivered to the bailee and the bailee retains possession over it) (citations omitted).

Here, Underwriters has proven that it had a bailment relationship with Defendants. Underwriters demonstrated that Amshield / Murjani delivered "The Mother Theresa" to Defendants for the purpose of Defendants caring for and storing the painting in its Long Island

---

[1] The Court will apply New York State substantive law and federal procedural law because the underlying events occurred in New York. *See A I Marine Adjusters*, 2007 WL 760415, at 4 n.3 (applying New York law in a bailment claim because the underlying events occurred in New York); *see also Hanna v. Plumer*, 380 U.S. 460, 465 (1965); *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938).

City warehouse in exchange for payment. (Schramm Aff. ¶¶ 7, 8; Compl. ¶¶12-13.) Underwriters also provided invoices from Atlantic to Guni Murjani for storage fees, which shows the contractual arrangement regarding Defendants' storage of Amshield / Murjani's artwork. (Schramm Aff. ¶¶ 7, 8, Exh. C; Compl. ¶¶12-13.)

"[A] warehouse which fails to redeliver goods to the person entitled to their return upon a proper demand, may be liable for either negligence or conversion, depending upon the circumstances." *I.C.C. Metals v. Mun. Warehouse Co.*, 50 N.Y.2d 657, 662 (1980) (citation omitted). Because Defendants failed to redeliver "The Mother Theresa" to Amshield / Murjani when Murjani inquired into its whereabouts (Schramm Aff. ¶¶ 12, 13, Exh. F; Compl. ¶¶ 22, 24-27), Defendants breached their bailment agreement with Amshield / Murjani and are liable for the missing painting.

    B.    <u>Negligence</u>

In a bailment relationship, once a bailor makes a request for the property, the bailee's failure to return the item establishes a prima facie case of liability for the bailee based upon a presumption of negligence. *Claflin v Meyer*, 75 N.Y. 260, 260 (1878). "Plaintiff has the burden of establishing delivery and failure to return. Thereafter the burden of coming forward with evidence to overcome the presumption is upon defendant." *Weinberg v. D-M Rest. Corp.*, 60 A.D.2d 550, 550 (1st Dep't 1977) (citations omitted). *See also I.C.C. Metals*, 50 N.Y.2d at 665-66 (explaining that the bailee must proffer an explanation for not returning the good, otherwise it will be liable in negligence). The defendant-bailee can rebut the presumption of negligence that arises from his failure to redeliver the good by showing that the good was lost or destroyed without negligence or that he exercised the care that a prudent man would use when caring for

his own good under similar circumstances. *Ouderkirk v Cent. Nat'l Bank of Troy*, 119 N.Y. 263, 263 (1890).

Here, a prima facie case for negligence was established once Amshield / Murjani delivered "The Mother Theresa" to Defendants (Schramm Aff. ¶¶ 7-8; Compl. ¶¶ 12-13) and Defendants failed to return the painting when Amshield / Murjani demanded its production. (Schramm Aff. ¶¶ 12-14; Compl. ¶¶ 21-27.)  To escape liability, Defendants have to show they acted non-negligently or with due care in relation to the loss of the good. *Id.*  Defendants did not appear or otherwise defend this action, as is evidenced by their default, so they did not present evidence to rebut the presumption of negligence. (Docket Entry 6.)  However, Underwriters did submit an e-mail from Lank stating that Atlantic could not locate "The Mother Theresa." (Schramm Aff., Exh. F.)  Nonetheless, Lank's e-mail did not offer any reason as to why Defendants did not act negligently or did act with due care in regard to the loss of "The Mother Theresa."  Accordingly, Defendants did not rebut the presumption of negligence levied against them, so they are liable to Underwriters under a claim of negligence.

    C.    <u>Conversion</u>

The New York Court of Appeals has been inconsistent in its holdings about how to establish an action in conversion based on a bailment relationship. *I.C.C. Metals*, 50 N.Y.2d at 666 (citations omitted).  Some cases state that a bailor can prove a prima facie case of conversion by demonstrating that the good was delivered to the bailee and the bailee did not return the good when the bailor made a demand for the good, as is the rule in bailment-negligence cases. *See id.* (citations omitted). Other cases require more, including that a plaintiff must show that the bailee undertook an intentional act "inconsistent with the plaintiff's interest in the property." *Id.* at 667

(citations omitted). However, the Court in *I.C.C. Metals* held that the same rule that applies to establishing a bailment-negligence case applies to proving a bailment-conversion case where "the bailee comes forward with insufficient proof of its explanation for the loss of the bailed goods."

As previously explained, Defendants did not proffer any explanation as to how "The Mother Theresa" was lost. Therefore, Underwriters can also recover in conversion against Defendants.

**II.  Damages**

Having shown liability by virtue of Defendants' default, Underwriters' claims for damages must be established so that the court may ensure that there is a proper basis to enter judgment in the amount demanded. *See Fustok v. ContiCommodity Servs., Inc.*, 873 F.2d 38, 40 (2d Cir. 1989). A court may make this determination based upon evidence presented at a hearing or upon a review of detailed affidavits and documentary evidence. *See id.*; FED. R. CIV. P. 55(b)(2); *Action S.A. v. Marc Rich & Co., Inc.*, 951 F.2d 504, 508 (2d Cir. 1991) (citations omitted).

  A. <u>Insured Value of "The Mother Theresa"</u>

"A warehouse unable to return bailed property either because it has lost the property as a result of its negligence or because it has converted the property will be liable for the full value of the goods at the time of the loss or conversion . . . ."[2] *I.C.C. Metals*, 50 N.Y.2d at 662-63 (citations omitted).

---

[2] The warehouse will be liable for less than the full value of the goods if "the parties have agreed to limit the warehouse's potential liability." *Id.* at 663. There is no evidence that the parties agreed to such a limitation here.

The insurance contract Underwriters submitted shows that Underwriters insured "The Mother Theresa" for £500,000 GBP.  (Schramm Aff. ¶¶ 4-6, Exh. A; Compl. ¶¶ 9-11.)  Amshield / Murjani executed a settlement agreement with Underwriters for £500,000 GBP in settlement of their claim regarding "The Mother Theresa."  (Schramm Aff. ¶ 16; Compl. ¶ 30.)  Underwriters provided the Form of Acceptance as proof of this settlement.  (Schramm Aff., Exh. G.)  Underwriters also provided a copy of the document confirming a wire transfer to Amshield / Murjani of £500,000 GBP in fulfillment of this settlement agreement on November 17, 2010.  (Schramm Aff. ¶ 17, Exh. H; Compl. ¶ 30.)  Amshield / Murjani subrogated their rights in "The Mother Theresa" to Underwriters by signing the settlement agreement and receiving the £500,000 GBP settlement for their insurance claim.  (Schramm Aff. ¶ 18, Exh. G-H.)  Because of the subrogation agreement, Underwriters has been subrogated to Amshield / Murjani's rights to the extent of Amshield / Murjani's damages in the amount of £500,000 GBP.  (Schramm Aff. ¶ 18; Compl. ¶ 32-33.)  Underwriters submitted the exchange rate for November 17, 2010, as published by the Federal Reserve, which establishes that £500,000 GBP equaled $795,000 based on a conversion rate of 1.59 USD for 1.0 GBP.  (Schramm Aff ¶ 19, Exh. I.)

I therefore accept Underwriters' damage demand and conclude that Defendants are liable to Underwriters in the amount of $795,000.00 for the lost painting.

B.   Prejudgment Interest

Plaintiffs seek prejudgment interest of nine percent per annum pursuant to Section 5001 and 5004 of the New York Civil Practice Laws and Rules ("N.Y. C.P.L.R.") as well.  *See Wicaksono v. XYZ 48 Corp.*, No. 10-CV-3635 (LAK) (JCF), 2011 WL 2022644 at *9 (S.D.N.Y. May 2, 2011) (citations omitted).  The United States Supreme Court has stated that prejudgment

9

interest is "an element of [plaintiff's] complete compensation." *Osterneck v. Ernst & Whinney*, 489 U.S. 169, 175 (1989) (quoting *West Virginia v. United States*, 479 U.S. 305, 310 & 310 n.2 (1987)). In *Schwimmer v. Allstate Ins. Co.*, 176 F.3d 648 (2d Cir. 1999), the Second Circuit held that the determination of prejudgment interest is properly considered a question of substantive law. *Schwimmer*, 176 F.3d at 650 (citation omitted). Accordingly, state law governs the calculation of prejudgment interest on state law claims. *See Marfia v. T.C. Ziraat Bankasi*, 147 F.3d 83, 90 (2d Cir. 1998) (citation omitted); *In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig.*, Nos. 00-CV-1898 (SAS), 04-CV-3417 (SAS), 2010 WL 1924708, at *1 (S.D.N.Y. May 12, 2010).

New York law provides that prejudgment interest should be awarded "from the earliest ascertainable date the cause of action existed." N.Y. C.P.L.R. § 5001(b). *See also Callier v. Superior Bldg. Servs., Inc.*, No. 09-CV-4590 (ILG) (JMA), 2010 WL 5625906, at *4 (E.D.N.Y. Dec. 22, 2010) (quoting N.Y. C.P.L.R. § 5001(b)). Therefore, I find that prejudgment interest should be calculated from November 17, 2010, the date Underwriters paid Amshield / Murjani in settlement of their insurance claim for "The Mother Theresa."

While New York law provides for prejudgment interest at a statutory rate of nine percent per year, N.Y. C.P.L.R. § 5004, courts retain discretion to apply a lesser interest rate. *Dubec v. N.Y. City Housing Auth.*, 834 N.Y.S.2d 165, 168 (1st Dep't 2007) (citations omitted); *see also Rodriguez v. N.Y. City Housing Auth.*, 91 N.Y.2d 76, 80 (1997) (statutory interest rate language to be read as a maximum rather than a statutorily-mandated rate, and courts may exercise discretion to impose a lower rate). To rebut the presumption of the nine percent rate, the defendant must proffer substantial evidence "that rates of return on both public and private

10

investments during the relevant time period are below nine percent." *Dubec*, 834 N.Y.S.2d at 168 (citing *Denio v. State of N.Y.*, 7 N.Y.3d 159, 168 (2006)). Should the defendant be able to make the requisite evidentiary showing, the burden then shifts back to the plaintiff to proffer evidence sufficient to establish that application of "a higher rate, up to the statutory maximum," would be reasonable under the circumstances. *Denio*, 7 N.Y.3d at 168. Since Defendants defaulted in this case, they clearly have not rebutted the presumptive nine percent statutory rate, and therefore, that rate will apply.

Applying a nine percent annual interest rate to Underwriters' award of $795,000.00 from November 17, 2010 to July 31, 2011 results in interest due in the amount of $50,181.12, according to Underwriters' calculations. This amount is reached by multiplying the principal, $795,000.00, by the interest rate of 9%, which results in $71,550.00 interest per annum. The per diem interest rate is calculated by dividing the yearly interest rate of $71,550.00 by 365 days, which equals $196.02.[3] This per diem rate is then multiplied by the number of days between November 17, 2010 and July 31, 2011, which is 256 days,[4] to arrive at the total of $50,181.12. Additional interest should be awarded to Underwriters in the amount of $196.02 per diem from August 1, 2011 to the date of entry of final judgment. I have reviewed and verified these interest calculations and find them to be accurate.

---

[3] The per diem calculation is actually $196.03 because the amount should be rounded up mathematically; however, Underwriters asks for $196.02 per diem, so they will be given that per diem amount. (Plaintiff's Memorandum of Law in Support of Motion for Default Judgment, dated August 3, 2011, at 8.)

[4] The amount of days between November 17, 2010 and July 31, 2011, including November 17th and July 31st is actually 257 days; however, since Plaintiff asked for 256 days of interest, they will be given that amount. (*Id.*)

## **CONCLUSION**

For the reasons explained above, I respectfully recommend that Underwriters be awarded $795,000.00 in damages, $50,181.12 in prejudgment interest, and $196.02 per diem in interest from August 1, 2011 through the date of entry of final judgment against Defendants Atlantic and Lank jointly and severally.

Any objections to the recommendations made in this Report must be filed with the Clerk of the Court and the Honorable Dora L. Irizarry within fourteen days of receipt hereof. Failure to file timely objections may waive the right to appeal the District Court's Order. *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(e), 72; *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989). Plaintiff is hereby directed to serve a copy of this Report and Recommendation upon Defendants by certified mail within two business days, at Defendants' last-known address, and to promptly thereafter file proof of service with the Clerk of the Court.


Dated: November 18, 2011
       Brooklyn, New York


*Ramon E. Reyes, Jr.*
**Ramon E. Reyes, Jr.**
**United States Magistrate Judge**